THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: June 16, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Beverly A. Bond*
*v.*
*Michael Taylor*

_____

Opposition No. 91213606

_____

Charles M. Allen of Goodman Allen Donnelly, PLLC for Beverly A. Bond.

John R. Crossan of Crossan IP Law, LLC for Michael Taylor.

_____

Before Bergsman, Gorowitz, and Hightower, Administrative Trademark Judges.

Opinion by Gorowitz, Administrative Trademark Judge:

This opinion illustrates the efficiency of the Board's Accelerated Case Resolution procedure ("ACR") when the parties use it effectively. In this particular case, the parties agreed to submit the evidentiary record supporting unsuccessful cross motions for summary judgment to the Board for resolution of the factual issues based on that record. As a result, the approach to ACR taken by the parties in this case resulted in a summary bench trial.

Michael Taylor (Applicant) filed an application to register the mark

 for:

> Caps, hats, jackets, t-shirts in International Class 25; and

> Education services, namely, providing live and on-line classes, seminars, workshops in the field of personal development in International Class 41.[1]

Beverly A. Bond (Opposer) opposed the application on the ground of priority and likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d). Specifically, Opposer alleges prior use and registration of the mark BLACK GIRLS ROCK! (standard characters) for:

> Tee shirts in International Class 25 and Charitable services, namely organizing volunteer programs for at-risk teenage women of color in International Class 35;[2] and

> Entertainment, namely, a continuing award show broadcast over television; arranging and conducting of concerts; and entertainment services in the nature of live musical performances in International Class 41.[3]

Applicant filed an answer admitting that "Applicant's t-shirts are related to the Opposer's products alleged in her registrations." Answer ¶ 14, 5 TTABVUE 3.[4]

---

[1] Application Serial No. 85866942 was filed on March 5, 2013, based upon Applicant's allegations of first use anywhere on or in connection with all of the goods and services since at least as early as January 25, 2013 and first use in commerce on or in connection with all of the goods and services since at least as early as February 1, 2013. The term "BLACK MEN" is disclaimed.

[2] Registration No. 3672086 issued August 5, 2009; combined Section 8 & 15 declaration accepted and acknowledged. The term "BLACK GIRLS" is disclaimed.

[3] Registration No. 4278243 registered January 22, 2013.

[4] Citations to the record will be to TTABVUE, the docket system for the Trademark Trial and Appeal Board. Because the Board primarily uses TTABVUE in reviewing evidence, the Board

Applicant denied all other salient allegations in the notice of opposition and asserted six "affirmative defenses."[5]

Applicant filed a motion for summary judgment on July 10, 2014. While Applicant's motion was denied in an order issued February 13, 2015, the Board found that Opposer had established standing and priority based on proof of Opposer's pleaded registrations.[6] Insofar as standing has been established and priority is not at issue, there will be no further reference to these elements of Opposer's case. Opposer then filed its own motion for summary judgment on likelihood of confusion, which was also denied. In both orders denying the parties' respective motions for summary judgment on likelihood of confusion, the Board noted that the remaining issues were relatively straightforward and encouraged the parties to stipulate to the resolution of the proceeding by means of the Board's Accelerated Case Resolution ("ACR") procedure. The parties agreed with the Board's suggestion and stipulated to a procedure that permitted resolution of the case on the basis of the summary judgment record.

---

prefers that citations to material or testimony in the record that has not been designated confidential include the TTABVUE docket entry number and the TTABVUE page number. *Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014); Trademark Trial and Appeal Board Manual of Procedure (June 2015) (TBMP) § 801.03 (2015).

[5] In an order dated February 5, 2014, the Board struck the following affirmative defenses: (1) failure to state a claim, (2) failure to maintain, police or enforce Opposer's rights in her trademark, and (3) abandonment of rights. 9 TTABVUE 5.

[6] Opposer declared under oath that she "first began youth mentoring services under the mark in September 2006." Applicant's First Set of Interrogatories," 29 TTABVUE 92. Since the September 2006 date precedes both Applicant's earliest alleged date of use (January 2013) and the filing date of his application (March 5, 2013), Opposer has also established priority based on her common law rights with respect to youth mentoring services.

- **ACR.**

ACR is intended as an expedited alternative to a traditional Trademark Trial and Appeal Board *inter partes* proceeding that involves full discovery, trial and briefing. The proceeding may take many forms, including a form similar to a motion for summary judgment or cross-motions for summary judgment with accompanying evidentiary submissions that the parties use as a substitute for a trial record and traditional briefs at final hearing. *See Conolty v. Conolty O'Connor NYC LLC,* 111 USPQ2d 1302, 1304 (TTAB 2014); and *Miller Brewing Co. v. Coy Int'l Corp.*, 230 USPQ 675 (TTAB 1986). *See also* Trademark Board Manual of Procedure (TBMP) § 528.05(a)(2) and authorities cited therein.

In order to take advantage of any form of ACR, the parties must stipulate that the Board may resolve any genuine disputes of material fact in the context of something less than a full trial. *Conolty,* 11 USPQ2d at 1304. For example, if the parties have already filed cross-motions for summary judgment, they may stipulate both that the Board may resolve any genuine disputes of material fact and consider the parties' cross-motions as the parties' final briefs in the case in lieu of a full trial. *See, e.g., Weatherford/Lamb Inc. v. C&J Energy Services Inc.*, 96 USPQ2d1834, 1836 (TTAB 2010); *Eveready Battery Co. v. Green Planet Inc.*, 91 USPQ2d 1511 (TTAB 2009). The parties may elect to proceed under ACR, relying on the summary judgment briefs and evidence, even where the earlier motions for summary judgment were denied. They may also agree to supplement previously-filed motions for summary judgment if necessary.

Further, as was done in this case, where the Board finds a case to be a suitable candidate for resolution under ACR, it may so inform the parties and seek their agreement to use ACR procedures. *See* TBMP § 702.04(a) (2015).

In a telephone conference with the Board on November 24, 2015, the parties agreed to use the Board's ACR procedure. A summary of the stipulations approved by the Board is set forth below:

- the Parties will principally rely upon the evidence submitted in connection with the two previously filed motions for summary judgment, and any supplemental declarations;

- the Parties may supplement their previously filed briefs on the motion for summary judgment, but will limit any supplemental briefs to ten pages;

- the Parties will forgo reply briefing;

- the burden of proof to establish her case by a preponderance of the evidence remains with Opposer and

- the Board may resolve disputes as to any material fact which the Board may find to exist and may issue a final ruling after considering the parties' ACR submissions.

- **The Record.**

The record includes the pleadings, and by operation of Trademark Rule 2.122(b), 37 CFR § 2.122(b), the file of the opposed application. In addition, the parties introduced the following evidence with their motions for summary judgment:

Opposer's evidence:[7]

1. Discovery Deposition of Opposer, Beverly A. Bond (Bond Depo.), Exhibit C to Opposer's Motion for

---

[7] Most of Opposer's evidence was submitted both with Opposer's Motion for Summary Judgment and with Opposer's Opposition to Applicant's Motion for Summary Judgment. We have cited to the substance of Opposer's motion, when applicable.

Summary Judgment (Opposer's MSJ), 29 TTABVUE 46-81;

2. Opposer's Amended Answers to Applicant's First Set of Interrogatories, Exhibit D to Opposer's MSJ, 29 TTABVUE 86-103;

3. Opposer's Responses to Applicant's First Request for Production of Documents, Exhibit E to Opposer's MSJ, 29 TTABVUE 105-140;

4. Declaration of Opposer's Attorney Charles M. Allen authenticating exhibits to Opposer's MSJ (Allen Decl.), Exhibit F to Opposer's MSJ, 29 TTABVUE 143-149;

5. Copies of information regarding Opposer from both magazines and newspapers and websites of the same, Exhibits G1-G5 to Opposer's MSJ, 29 TTABVUE 151-179;

6. Wikipedia article about Opposer, Exhibit H to Opposer's MSJ, 29 TTABVUE 181-182;

7. Social media postings from Opposer's Twitter and Facebook account, Exhibits I and J to Opposer's MSJ, 29 TTABVUE 184-194;

8. Discovery deposition of Applicant, Michael Wayne Taylor, and exhibits thereto, Exhibit O to Opposer's MSJ, 29 TTABVUE 196-243;

9. Documents from the application file from the USPTO's Trademark Search System (TESS) and Trademark Status & Document Retrieval System (TSDR) - Exhibit P to Opposer's MSJ, 29 TTABVUE 245-253;

10. Articles about Beverly A. Bond, Exhibits K and L to Opposer's MSJ, 29 TTABVUE 255-261;

11. Applicant's Responses to Opposer's Interrogatories, Exhibit M to Opposer's MSJ, 29 TTABVUE 263-271;

12. Applicant's Responses to First Requests for Production, Exhibit N to Opposer's MSJ, 29 TTABVUE 273-296; and

13. Webpages from Opposer's website providing information about Opposer's services; Opposer, Opposer's sale of goods; promotional material, and information regarding televised awards show, Exhibit F2 to Opposer's Response to Applicant's Motion for Summary Judgment (Applicant's MSJ), 18 TTABVUE.

Applicant's evidence:[8]

1. Selected questions and answers thereto from Opposer's Amended Answers to Applicant's First Set of Interrogatories, Exhibit A to Applicant's MSJ, 13 TTABVUE 7-12;

2. Selected questions and answers thereto from Applicant's Responses to Opposer's Interrogatories, Exhibit A to Applicant's MSJ, 13 TTABVUE 13-15;

3. Webpages from Black Women Rock! website (blackwomenrock.com), Exhibit E to Applicant's MSJ, 13 TTABVUE 19; and

4. Google Search results for "black women rock," Exhibit F to Applicant's MSJ, 13 TTABVUE 19.

- **Likelihood of Confusion.**

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973); *see also Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005); *In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In considering the evidence of record on

---

[8] Applicant also submitted a copy of USPTO records for cancelled Registration No. 4155903 (BLACK KIDS ROCK!) and abandoned application, Serial No. 85457282 (BLACK CHICKS ROCK!!! & design), which, as discussed below, have no probative value.

these factors, we keep in mind that "[t]he fundamental inquiry mandated by Section 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976); *see also In re Dixie Rests. Inc.,* 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997).

## 1. Similarity or dissimilarity of the goods and services, channels of trade and class of purchasers.

We start our analysis with the second and third *du Pont* factors and look at the relationship between the goods and services at issue, the channels of trade in which they travel and the class of purchasers. When determining the relationship between the goods and services,

> [t]he authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods [and services] set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which sales of the goods [and rendering of services] are directed.

*Octocom Systems, Inc. v. Houston Computers Services Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *see also Stone Lion Capital Partners, LP v. Lion Capital LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1161-1162 (Fed. Cir. 2014). "[A] likelihood of confusion may be found with respect to a particular class based on any item within the identification of goods for that class." *Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, 1073 (TTAB 2011); *see also Tuxedo Monopoly Inc. v. General Mills Fun Group,* 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981).

Applicant's caps, hats, jackets, t-shirts and the t-shirts in Opposer's registration are in part identical. In addition, there are no restrictions in either the application or the registration as to the channels of trade in which Applicant's and Opposer's goods are sold. "It is well established that absent restrictions in the application and registration, [identical] goods and services are presumed to travel in the same channels of trade to the same class of purchasers." *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d, 1905, 1908 (Fed. Cir. 2012). Because the goods are in-part identical, the identical goods are presumed to travel in the same channels of trade to the same classes of purchasers.

Next, we look at the services at issue. The services in the application are identified as "education services, namely, providing live and on-line classes, seminars, workshops in the field of personal development"; and the services in the Opposer's registrations are identified as: "charitable services, namely, organizing volunteer programs for at-risk teenage women of color"; and "entertainment, namely, a continuing award show broadcast over television; arranging and conducting of concerts; and entertainment services in the nature of live musical performances."

Applicant contends that his services would not be confused with Opposer's services because they are intended for black men, not black girls.[9] We first note there is no such limitation in Applicant's identification of services. *Octocom*, 16 USPQ2d at

---

[9] *See* Applicant's Reply Brief in support of his MSJ, 20 TTABVUE 5.

1687. Moreover the services do not have to be identical to support a finding that there is a likelihood of confusion.

> It is settled that it is not necessary that the respective services be identical or even competitive in order to support a finding of likelihood of confusion. That is, the issue is not whether consumers would confuse the services themselves, but rather whether they would be confused as to the source of the services. It is sufficient that the services be related in some manner, or that the circumstances surrounding their use be such that they would be likely to be encountered by the same persons in situations that would give rise, because of the marks used thereon, to a mistaken belief that they originate from or are in some way associated with the same source or that there is an association or connection between the sources of the respective services.

*Miss Universe L.P. v. Community Marketing Inc.*, 82 USPQ2d 1562, 1568 (TTAB 2007) (finding MR. GAY UNIVERSE for gay beauty pageants confusingly similar to MISS UNIVERSE for beauty pageants and contests); *see also Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012).

Based on the evidence discussed below, we find that Opposer's charitable services, which include the organization of volunteer programs, are related to Applicant's educational services. When asked in an interrogatory to "describe in detail the nature of Opposer's businesses relating to Opposer's Mark, including the date on which Opposer first engaged in each such business," Opposer replied,

> BLACK GIRLS ROCK! INC. empowers and mentors youth of color, promotes the arts for young women of color, and encourages dialogue and analysis of the way women of color are portrayed in the media. … It provides mentoring services and it conducts the annual BLACK GIRLS ROCK! Queens' Camp for Leadership and Excellence. It also sells and distributes clothing items in support of its mission.

10

Opposer's Motion for Summary Judgment, Exhibit D – "Opposer's Amended Answers to Applicant's First Set of Interrogatories," 29 TTABVUE 92.

Applicant admitted in his discovery deposition that the programs that he and Opposer offer are related:

> Q.      Other than the fact that the program is for African American girls and yours is for African American men, would you agree that the Black Girls Rock activities are devoted toward improving the self-esteem of black girls?
>
> A.      Yes, I would agree with that.
>
> Q.      And your program is devoted toward building the esteem of black men?
>
> A.      Correct.
>
> Q.      And their program is devoted toward the empowerment of African American girls, correct?
>
> A.      Correct.
>
> Q.      And yours is devoted to the empowerment of African American men, correct?
>
> A.      Correct.
>
> Q.      Essentially setting aside the distinction and the participants, the programs themselves are similar, are they not?
>
> A.      Similar.

Opposer's Motion for Summary Judgment, Exhibit O – "Discovery deposition of Applicant, Michael Wayne Taylor" and exhibits thereto, Exhibit O to Opposer's MSJ, 29 TTABVUE 209. Further, since Applicant's recitation of services does not restrict his education services to "black men," these services could be rendered to "black girls." Moreover, as Opposer testified, while the identification in her registration is limited

to "teenage women of color," her common law rights are not so limited in that her services involve "black men":

> Q.     Have you ever used any black men in [sic] as role models for black girls?
>
> A.     Yes.
>
> Q.     Who were those?
>
> A.     In 2007, we started to also honor men, because we wanted to make sure that this was an inclusive organization, with the intention of launching our boys program.

Opposer's Motion for Summary Judgment, Exhibit O – "Discovery deposition of Opposer, Beverly Bond," Exhibit C to Opposer's MSJ, 29 TTABVUE 51. Ms. Bond also testified that "we also had men participate outside of being honorees. They participate in our programs and speak to our girls." *Id* at 52.

> Q.     What do the men tell girls?
>
> A.     It's an empowerment circle. We have empowerment circles, where people talk about their success and their struggles – their past success.

*Id.* As established by this evidence, the services are related.

As discussed, the second *du Pont* factor favors a finding of likelihood of confusion with respect to both Applicant's goods and services. With respect to the clothing articles in both the application at issue and Opposer's registration, the third *du Pont* factor favors a finding of likelihood of confusion. However, while the consumers may be identical, the evidence is not sufficient to establish an overlap in the channels of trade for the services. *See Parfums de Couer Ltd. v. Lazarus*, 83 USPQ2d 1012, 1021 (TTAB 2007) ("[T]he mere fact that goods and services may both be advertised and

offered through the Internet is not a sufficient basis to find that they are sold through the same channels of trade. The Internet is such a pervasive medium that virtually everything is advertised and sold through the Internet."). Accordingly, we find the channels of trade factor to be neutral with respect to the parties' services.

### 2. The number and nature of similar marks in use on similar goods and services.

Applicant argued that the records of the U.S. Patent and Trademark Office support his position that the marks are different because "the Office has allowed different BLACK --- ROCK format marks." Applicant's Motion for Summary Judgment, 13 TTABVUE 3. Applicant specifically cites a cancelled registration (BLACK KIDS ROCK!) and an abandoned application (BLACK CHICKS ROCK!!! & design). The existence of a cancelled registration and an abandoned application does not establish that Opposer's mark is weak. As the Board stated in the order denying Applicant's motion for summary judgment:[10]

> Cancelled registrations are 'only evidence that the registration issued and does not afford … any legal presumptions under Trademark Act Section 7(b),' including the presumption that the registrations are valid, that the registrations are currently owned by the listed registrant, or that the registrant has the exclusive right to use the mark in commerce in connection with the goods and services specified in the registration certificate.' *See In re Pedersen*, 109 USPQ2d at 1197 (*citing Anderson, Clayton & Co. v. Krier*, 178 USPQ at 47 (statutory benefits of a registration disappear when the registration is cancelled)).

---

[10] 25 TTABVUE 8-9.

Moreover, rights in an application are contingent upon registration.[11] Therefore, neither the abandoned application nor the cancelled registration are probative of the strength of Opposer's mark.

Applicant also argues that the Internet evidence he submitted of use of third-party use of the mark BLACK WOMEN ROCK[12] establishes that Opposer is not entitled to her registration. It is not clear whether this argument is asserted to establish that third-party use renders Opposer's mark weak or whether Applicant is attacking the validity of Opposer's registration based on a third-party's use of a similar mark.

While "sufficient evidence of third-party use of similar marks can show that customers … have been educated to distinguish between different … marks on the basis of minute distinctions,"[13] the single use proffered by Applicant is insufficient to establish that Opposer's mark is weak. To the extent that Applicant is claiming that Opposer's registration should not have issued or cannot be maintained, Applicant is attacking the validity of Opposer's registration. The proper action for attacking the validity of a registration is a cancellation action. *Fiserv, Inc. v. Elec. Transaction Sys. Corp.*, 113 USPQ2d 1913, 1919 n.7 (TTAB 2015) (stating that absent a counterclaim, an applicant may not pursue an impermissible collateral attack on an opposer's

---

[11] Section 7 (c) of the Trademark Act; 15 U.S.C. § 1057 (c). Applications are evidence only that they were filed. *Nike Inc. v. WNBA Enters. LLC*, 85 USPQ2d 1187, 1193 n.8, 1201 (TTAB 2007).

[12] From the website located at www.blackwomenrock.com.

[13] *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015).

registration); *see also Dixie Rests. Inc.,* 41 USPQ2d at 1534-35; *Contour Chair-Lounge Co. v. Englander Co.,* 324 F.2d 186, 139 USPQ 285, 287. In any event, as noted above, evidence of one third-party user of a mark that is similar to Opposer's mark is not sufficient to establish that Opposer's mark is a weak mark entitled to only a narrow scope of protection or exclusivity of use especially when Applicant has not introduced any evidence regarding the extent to which that mark has been used. *See Hunter Indus., Inc. v. Toro Co.,* 110 USPQ2d 1651, 1662 (TTAB 2014). *Cf. In re Mr. Recipe, LLC,* 118 USPQ2d 1084, 1089 (TTAB 2016) ("[O]ne third-party registration has little probative value, especially in the absence of evidence that the mark is in use on a commercial scale or that the public has become familiar with it.").

Accordingly, we find the sixth *du Pont* factor to be neutral.

### 3. Similarity or dissimilarity of the marks.

We continue our analysis with the first *du Pont* factor, the similarity or dissimilarity of the marks and BLACK GIRLS ROCK! (standard characters) and compare them "in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay Imps.,* 73 USPQ2d at 1691. "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a *connection between the parties." Coach Servs., Inc.*, 101 USPQ2d at 1721 (emphasis added).

While "the similarity or dissimilarity of the marks is determined based on the marks in their entireties … there is nothing improper in stating that, for rational

reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties." *In re National Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

In this case, Applicant's mark is a composite mark consisting of a verbal or literal portion and a design. When evaluating a composite mark containing both words and designs, the verbal portion of the mark often is more likely to indicate the origin of the goods to which it is affixed because it is the portion of the mark that consumers would use to refer to or request the goods or services. *Viterra*, 101 USPQ2d at 1908, 1911.

The only differences in the literal portions of the marks BLACK MEN ROCK and BLACK GIRLS ROCK! are the word "MEN" in Applicant's mark, and the word "GIRLS" and the exclamation point in Opposer's mark. Both marks connote that the subject of the services ("black girls" and "black men") are "very good, impressive, or exciting."[14] Thus, Opposer's and Applicant's marks suggest that the programs offered by Opposer and Applicant improve the self-images of the participants. Both the design in Applicant's mark, consisting of the silhouette of a man with his arms

---

[14] *Dictionary.com Unabridged.* Random House, Inc. http://www.dictionary.com/browse/rock (accessed: May 03, 2016). The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed format or have regular fixed editions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006).

outstretched in a sign of victory, and the exclamation point in Opposer's mark emphasize the positive outcome the programs hope to have on the participants.

As such, while there are differences between the marks, the connotations and overall commercial impressions are similar and the similarities outweigh the differences.

Accordingly, we find that the marks are similar and the first *du Pont* factor favors a finding of likelihood of confusion.

### 4. No actual confusion.

Applicant's argument that there has been no actual confusion is not persuasive. The lack of actual confusion over a substantial period of time accompanied by proof that would permit a finding that there was a meaningful opportunity for such confusion to occur may be significant,[15] but here, there is nothing in the record regarding the extent of use, if any, of Applicant's mark. "Thus, we are unable to determine if there has been any meaningful opportunity for confusion to occur in the marketplace. In any event, the test is likelihood of confusion, not actual confusion, and, as often stated, it is unnecessary to show actual confusion in establishing likelihood of confusion." *In re Big Pig Inc.,* 81 USPQ2d 1436, 1439-40 (TTAB 2006); *see also Weiss Associates Inc. v. HRL Associates Inc.,* 902 F.2d 1546, 14 USPQ2d 1840

---

[15] *See generally G.H. Mumm & Cie. v. Desnoes & Geddes, Ltd.,* 917 F.2d 1292, 1295, 16 USPQ2d 1635, 1638 (Fed. Cir. 1990); *King Candy Co. v. Eunice King's Kitchen, Inc.,* 496 F.2d 1400, 1401-02, 182 USPQ 108, 110 (CCPA 1974); *In re Myers,* 201 F.2d 379, 384, 96 USPQ 238, 242 (CCPA 1953)

(Fed. Cir. 1990), and *Giant Food, supra*. Thus, we find the seventh *du Pont* factor to be neutral.

- **Conclusion.**

Having considered all the evidence and arguments on the relevant *du Pont* factors, whether specifically discussed herein or not, we conclude that Applicant's mark for "caps, hats, jackets, t-shirts" and "education services, namely, providing live and on-line classes, seminars, workshops in the field of personal development" is likely to cause confusion with Opposer's mark BLACK GIRLS ROCK! for "t-shirts" and "charitable services, namely organizing volunteer programs for at-risk teenage women of color," which include "volunteer, mentorship, arts education, cultural exploration, public service and leadership programs that place special emphasis on personal development through the arts and cooperative learning."

*Decision:* The opposition is sustained.